Counts I and II of the complaint are qui tam claims brought by Kietzman on behalf of the United States. Count I charges presentment of false or fraudulent claims in violation of the FCA; Count II charges conspiracy to commit the same. Counts III and IV are claims filed by Kietzman personally, respectively charging wrongful and retaliatory discharge under state law and under the FCA. Bethany Circle attacks the three federal claims as insufficiently pleaded and urges us to relinquish jurisdiction over the state claim.
Standard of Decision
Federal Rule of Civil Procedure 8(a) requires "a short and plain statement showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). To satisfy the requirements of Rule 8(a) and withstand a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face ...." Swanson v. Citibank, N.A. , 614 F.3d 400, 404 (7th Cir. 2010) (quoting Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ). A claim is facially plausible when supported by sufficient factual allegations which, taken as true, give rise to a reasonable inference of liability. Iqbal , 556 U.S. at 678, 129 S.Ct. 1937 (citing Bell Atl. Corp. v. Twombly , 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). Legal conclusions, formulaic recitation of elements of the cause of action, and speculative possibilities will not do. Id. In all, the pleader must simply "give enough details about the subject-matter of the case to present a story that holds together." Swanson , 614 F.3d at 404.
But the complaint's Counts I and II are subject to a heightened pleading standard. Because such claims under the False Claims Act sound in fraud, the circumstances alleged to constitute the fraud must be pleaded with "particularity." Fed. R. Civ. P. 9(b) ; United States ex rel. Presser v. Acacia Mental Health Clinic, LLC , 836 F.3d 770, 775 (7th Cir. 2016) (citing *974 United States ex rel. Gross v. AIDS Research All.-Chi. , 415 F.3d 601, 604 (7th Cir. 2005) ).[1] Under Rule 9(b), a relator must allege "the first paragraph of any newspaper story": "the who, what, when, where, and how" of the alleged fraud. United States ex rel. Lusby v. Rolls-Royce Corp. , 570 F.3d 849, 853 (7th Cir. 2009) (quoting DiLeo v. Ernst & Young , 901 F.2d 624, 627 (7th Cir. 1990) ). While it is "erroneous[ ]" to "take an overly rigid view of th[is] formulation," Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co. , 631 F.3d 436, 442 (7th Cir. 2011), quoted in Acacia , 836 F.3d at 776, the application of which "may vary on the facts of a given case[,]" id. , Rule 9(b) must require "some ... means of injecting precision and some measure of substantiation ... [,]" id. (quoting 2 James W. Moore, Moore's Federal Practice § 9.03 (3d ed. 2010) ), if it is to serve its important functions of "forc[ing] the plaintiff to conduct a careful pretrial investigation" and "protect[ing] defendants from [the] 'privileged libel' " of fraud charges. Id. at 441 (quoting Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co. , 412 F.3d 745, 749 (7th Cir. 2005) ; Kennedy v. Venrock Assocs. , 348 F.3d 584, 594 (7th Cir. 2003) ). "It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." Lusby , 570 F.3d at 854-55.
Analysis
Although the strictures of Rule 9 are supposed to force the plaintiff to investigate first and sue later, it is clear based on her complaint that Kietzman has not heeded that admonition. See also Fed. R. Civ. P. 11(b) (requiring inquiry "reasonable under the circumstances"). Kietzman's allegations (when not wholly conclusory) appear to be the product, not of careful pretrial investigation, but of her partial, limited perspective as a single employee, based entirely on her own imperfectly understood, decontextualized impressions and recollections, leaving key terms, concepts, and events unexplained. We take up each of her claims below, beginning with the three federal claims.
I. Submission of False Claims to Medicare, FCA (Count I)
The FCA provides that a person is liable to the United States if she "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[,]" 31 U.S.C. § 3729(a)(1)(A), or if she "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" Id. § 3729(a)(1)(B). Such claims may be brought on behalf of the United States by a relator functioning as a "private attorney[ ] general ...." Lang v. Nw. Univ. , 472 F.3d 493, 495 (7th Cir. 2006).
To state a claim under Subsection (A), a relator must show: "(1) a false claim (2) which the defendant presented or caused to be presented to the United States for payment (3) knowing that the claim was false." United States ex rel. Morison v. Res-Care, Inc. , No. 4:15-cv-94, 2017 WL 468287, at *2 (S.D. Ind. Feb. 3, 2017) (citing Fowler v. Caremark RX, L.L.C. , 496 F.3d 730, 740-41 (7th Cir. 2007), overruled in nonrelevant part by Glaser v. Wound Care Consultants , 570 F.3d 907 (7th Cir. 2009) ). To state a claim under Subsection (B), a relator must show that "(1) the defendant made a statement in order to receive money from the government; (2) the statement was false; and (3) the defendant knew the statement was false[,]" id. (citing Fowler , 496 F.3d at 741 ), as well as (4) materiality.
*975 31 U.S.C. § 3729(a)(1)(B) ; see id. § 3729(b)(4) (defining materiality).
With respect to liability for noncompliance with federal regulations (or rules or statutes or contractual obligations), three general principles guide our analysis. First, to be simultaneously in receipt of government money and in violation of federal regulations is not fraud under the FCA. United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc. , 772 F.3d 1102, 1107 (7th Cir. 2014). Second, an express certification of compliance made with present knowledge of its falsity or with the present intent not to honor it is fraud under the FCA if the certification is material to the government. 31 U.S.C. § 3729(a)(1)(B) ; United States ex rel. Lusby v. Rolls-Royce Corp. , 570 F.3d 849, 854 (7th Cir. 2009). Third, an implied certification of compliance is fraud under the FCA where, "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." Univ'l Health Servs., Inc. v. United States ex rel. Escobar , --- U.S. ----, 136 S.Ct. 1989, 2001, 195 L.Ed.2d 348 (2016).
Kietzman's complaint alleges six sets of false claims, or, more accurately, six ways in which federal regulations were flouted at the Hospital. The first is that Hospital radiologists would perform, and bill the government for, two full diagnostic scans on oncology patients, though the second scan was "improper and unnecessary." SAC ¶ 23. The second is that the Hospital paid for, and presumably billed the government for, "fiducial markers" implanted by contractor urologists, a kind of kickback to the urologists. Id. ¶ 49. The third is that the Hospital directed employees other than "physicians and credentialed medical assistants" to enter orders into the "electronic medical system" in violation of the government's "meaningful use" mandate. Id. ¶ 50. The fourth is that the Hospital directed physicians who did not meet the criteria to be a "supervising provider" in the oncology department to fill that role nevertheless. Id. ¶ 52. The fifth is that radiation therapy was performed without direct supervision by a physician, contrary to federal rules. Id. ¶ 56. The sixth is that "full anatomical ultrasound[s]" would be performed by Hospital radiologists when the ordering physician had only requested "limited or partial ultrasounds[.]" Id. ¶ 75.[2] We discuss these theories below in light of the general principles above.
A. Falsity
"[I]t is essential to show a false statement" or claim. Lusby , 570 F.3d at 854. Kietzman has not. Kietzman has not pleaded with particularity a single actionable express or implied certification made by the Hospital. The "general statement" about certifying compliance with the whole body of applicable federal regulations contained in paragraph 20 of the second amended complaint "is not sufficient to satisfy Rule 8, let alone Rule 9(b)." United States ex rel. McGinnis v. OSF Healthcare Sys. , No. 11-cv-1392, 2014 WL 378644, at *7 (C.D. Ill. Feb. 3, 2014).
For example, with respect to the unnecessary radiological scans, the complaint alleges *976 simply that they were "improper and unnecessary." SAC ¶ 23. The complaint never alleges that, by regulation or contract, the Hospital specifically and expressly certified to Medicare that it would provide only proper and necessary radiological scans.[3] Nor does the complaint allege that the Hospital impliedly made specific representations about the radiological scans which were misleading half-truths due to the Hospital's omission of the fact that Kietzman deemed them unnecessary or improper. In short, there is no allegation at all that the Hospital concealed what it was doing (for example, by use of false or misleading billing codes) from the government. Apparently, the Hospital would simply send Medicare two bills for two radiological scans for the same patient within two weeks, and the government would pay them. Kietzman may quibble with the government's payment decisions as being an unwise use of taxpayer funds, but she has nowhere alleged the fraudulent procurement of such funds.
These same flaws are not cured with respect to any other of Kietzman's allegations of impropriety. She alleges repeatedly that federal regulations were violated at the Hospital, and that the government would not have paid out claims for treatment where such violations had occurred at some stage of the treatment process, but nowhere alleges how, or even whether, the Hospital concealed or falsely represented what it was doing to the government. Accordingly, Kietzman's complaint fails to state a claim for actionable fraud under the FCA.
B. Materiality
Materiality is a "familiar and rigorous" standard to be enforced as necessary on a motion to dismiss. Escobar , 136 S.Ct. at 2004 n.6. Kietzman's complaint fails to satisfy it.
Under the FCA, materiality means "having a natural tendency to influence, or be capable of influencing, the payment" by the government. 31 U.S.C. § 3729(b)(4). "Under any understanding of the concept,[4] materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Escobar , 136 S.Ct. at 2002 (alteration, *977 quotations, and citation omitted). Not every breach of contract or regulation is material, and "minor or insubstantial" noncompliance never is. Id. at 2003. The government's designation of particular compliance as a condition of payment does not in itself satisfy materiality, nor does a showing that the government "would have the option to decline to pay if it knew of the defendant's noncompliance." Id.
[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include ... evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.
Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.
Id. at 2003-04.
Though Kietzman's complaint would impose liability on Bethany Circle entirely or nearly so for noncompliance with federal regulations, and she therefore must show the materiality of the Hospital's implied or express certifications under either Subsection (A) or Subsection (B), the complaint does not contain a single nonconclusory allegation of materiality. Kietzman either alleges baldly that a certain alleged act of noncompliance was "material," or, restating the concept, that the government "would not have paid" had it known of the Hospital's alleged noncompliance. See, e.g., SAC ¶¶ 25, 35, 49, 50, 52, 73, 77, 78, 83. No facts are alleged as to what types of claims the government usually did or did not pay, nor as to what the government's compliance priorities were, nor as to the degree of severity of the Hospital's alleged breaches of regulation. For example, does Medicare usually refuse to pay claims for treatment where any order issued in the course of the treatment was entered into "the electronic medical system" neither "by a licensed healthcare professional [n]or a credentialed medical assistant"? Id. ¶ 50. We have no way of knowing because the complaint is utterly silent on the issue.
"The materiality standard is demanding." Escobar , 136 S.Ct. at 2003. Kietzman's bald conclusions here have not met its demands, and accordingly fails to state a claim for actionable fraud under the FCA.
C. First-Paragraph Particularity Problems
Quite apart from the failures of Kietzman's complaint to show falsity and materiality, the complaint's allegations do not state the circumstances of any fraud with particularity. To begin with, Kietzman has not identified with particularity a single false claim or statement actually submitted or made to the government to extract payment from it. Grenadyor , 772 F.3d at 1107 (7th Cir. 2014) ("To comply with Rule 9(b) [relator] would have had to allege either that the pharmacy submitted a claim to Medicare ... on behalf of a specific patient who had received a kickback, or at least name a Medicare patient who had received a kickback ...."); Fowler , 496 F.3d at 741-42 ("Relators do not present any evidence at an individualized transaction level to demonstrate" fraudulent retention of federal refunds);
*978 United States ex rel. Garst v. Lockheed-Martin Corp. , 328 F.3d 374, 378 (7th Cir. 2003) ("Some [allegations] come close[ ] to specific allegations of deceit but fail to link them to any claim for payment."); United States ex rel. Soulias v. Nw. Univ. , No. 10 C 7233, 2013 WL 3275839, at *3 (N.D. Ill. June 27, 2013) ("To satisfy Rule 9(b) for an FCA claim, a relator must plead at least some actual examples of false claims.") (citing five cases in addition to those already cited here). While " 'plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts,' they must still 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud[.]" Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co. , 631 F.3d 436, 442 (7th Cir. 2011) (quoting 2 James W. Moore, Moore's Federal Practice § 9.03 (3d ed. 2010) ). Kietzman's complaint employs no such means or measures.
Indeed, Kietzman does not even allege on personal knowledge that any Medicare beneficiary was ever treated at the Cancer Center. "Upon information and belief," Kietzman alleges that "a significant percentage" of the Cancer Center's radiology patients were "Medicare/Medicaid patients[,]" SAC ¶ 24, but fraud cannot be alleged on information and belief unless the relevant facts are not accessible to the pleader and she provides the grounds for her suspicions. Pirelli , 631 F.3d at 443.[5] As the former director of the Cancer Center, Kietzman would not be overtaxed to allege on personal knowledge an approximate figure for Medicare patients at the Cancer Center, and in any event cannot plausibly claim to have lacked access to such a figure. Nor does any ground for her supposition as pleaded appear in the complaint. Even if, counterfactually, Kietzman's allegations were sufficient to allege that one of the "approximately 100 ... improper and unnecessary" radiological scans was probably administered to a Medicare beneficiary, SAC ¶ 24, that cannot suffice with respect to, for example, the direct-supervision violations, which the complaint does not even allege actually occurred. The complaint alleges only that Morgan told Kietzman the Hospital "would 'have to make it work,' because a physician was unable to come in." Id. ¶ 56 (emphasis added). The complaint does not allege that any radiation therapy was actually administered to any patient, much less a Medicare patient, on the single day, apparently September 9, 2015, that "a physician was unable to come in." Id.
Kietzman points us to Lusby , where relator, an engineer, was allowed to proceed in his qui tam suit without "produc[ing] the invoices" for the fraudulent payments he alleged, which he could not be expected to have had "unless he work[ed] in the defendant's accounting department," which he did not. 570 F.3d at 854. But, there, relator was able to specify "five contracts between Rolls-Royce and the United States" and the "particular specifications" provided for by them; test results showing that Rolls-Royce's products did not meet those specifications; "specific parts shipped on specific dates, and ... details of payment"; and, finally, the specific certification of contractual compliance Rolls-Royce would have made to the government in order to receive such payment. Id. at 853-54. The only inference required was that *979 the certifications were actually made, but that was an entirely reasonable inference given the predicates specifically alleged. Here, by contrast, no predicate facts are alleged from which to draw any inference; there is merely an allegation on information and belief that the federal government footed the bill for a "significant percentage" of the Cancer Center's patients. SAC ¶ 24. That is not enough.[6]
Moreover, while the complaint faults the Hospital for failing to comply with applicable federal regulations, it has not identified with particularity a single federal regulation allegedly violated. That is a problem.
Where the allegedly false certification relates to a failure to comply with certain statutory and regulatory provisions, the plaintiff should be able to tell the [defendant] which ones it flouted, and how and when. If the particularity requirement is meant to ensure more thorough investigation before filing, it is not too much to ask that one aspect of that investigation include the specific provisions of law whose violation made the certification of compliance false.
United States ex rel. Hanna v. City of Chicago , 834 F.3d 775, 779 (7th Cir. 2016).
Here is Kietzman's best attempt to satisfy DiLeo 's first-paragraph standard with respect to the allegedly unnecessary radiological scans: "Who submitted the false claims? The Defendant." Pl.'s Br. Opp. 26. That is a risible response. The Bethany Circle of King's Daughters' of Madison, Indiana, Inc. did not submit anything within the meaning of Rule 9(b) ; one of the Hospital's employees did. But which of them? Kietzman cannot tell us. "What did they submit? Claims for payment for duplicate, full diagnostic scans for RadPlanning, after an initial scan." Id. Missing is any particularized showing such claims were actually presented, or that they were false . "When? From January 1, 1999, to the present, submitting about 100 of them a year." Id. That is worse than risible; it is flatly misleading. No allegation in the complaint reaches back to 1999 except as to Kietzman's hiring date. No allegation in the complaint reaches forward to May 3, 2017 (the day Kietzman filed her response, Dkt. 79), because Kietzman was fired from the Hospital in October 2015. And there is nothing particularized in alleging, without more, that an event happened "about" one hundred times per year over an eighteen-year period. "Where? From Defendant's facility, in Southern Indiana, and submitted to Medicare. How? Again, through CMS and Medicare billing portals." Id. But that is no more than a general allegation that the Hospital sometimes billed Medicare.
In sum, Kietzman's complaint falls far short of alleging actionable fraud under the FCA with particularity.
II. Conspiracy to Defraud, FCA (Count II)
The FCA provides that a person is liable to the United States if she conspires to violate the FCA, as relevant here, by presenting a false claim or making a false statement material to a false claim. 31 U.S.C. § 3729(a)(1)(C). "[G]eneral civil conspiracy principles apply to FCA conspiracy claims."
*980 United States ex rel. McGee v. IBM Corp. , 81 F.Supp.3d 643, 666 (N.D. Ill. 2015) (citing United States ex rel. Durcholz v. FKW, Inc. , 189 F.3d 542, 545 n.3 (7th Cir. 1999) ). Accordingly, "[t]o plead a conspiracy claim, the relator must allege an agreement by two or more persons to accomplish a goal or goals and an act in furtherance of that agreement." United States ex rel. Morison v. Res-Care, Inc. , 4:15-cv-94, 2017 WL 468287, at *4 (S.D. Ind. Feb. 3, 2017) (citing Indep. Trust Corp. v. Stewart Info. Servs. Corp. , 665 F.3d 930, 938-39 (7th Cir. 2012) ). The act in furtherance of the agreement must be overt and result in actual damage or injury. United States ex rel. Rockey v. Ear Inst. of Chi., LLC , 92 F.Supp.3d 804, 825 (N.D. Ill. 2015) (distinguishing civil and criminal conspiracy) (quoting Lenard v. Argento , 699 F.2d 874, 882 (7th Cir. 1983) ). "Put differently, an actionable FCA conspiracy exists only where at least one of the alleged co-conspirators actually committed an FCA violation." Id. at 826. Moreover, agents of the same corporate principal cannot actionably conspire with one another. Id. (citing inter alia Copperweld Corp. v. Indep. Tube Corp. , 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (Sherman Act conspiracy) ).
Kietzman has not sufficiently alleged either an agreement or an injury resulting from it. First, for the reasons stated above, Kietzman's complaint fails to allege an FCA violation, and therefore fails to show actual injury resulting from any conspiracy to defraud the government. Her conspiracy claim therefore fails.
Second, because Kietzman cannot allege conspiracy by claiming, for example, that Morgan and Dozier (both as agents of the Hospital) agreed with one another to defraud the government, she must rely on a conspiracy between Hospital staff and the independent-contractor radiologists and urologists. See SAC ¶¶ 87-88. But the complaint alleges effectively nothing about either of those two groups.
Kietzman never alleges that any particular radiologist or urologist entered into a particular agreement with particular Hospital staff to undertake a particular fraudulent act. As to the radiologists in general, the only allegations appearing in the complaint are that they were "sensitive," SAC ¶ 58, "defensive," id. , or "touchy," id. ¶ 63, about billing concerns. That is a far cry from a particularized allegation of an agreement to defraud the government. As to the urologists' involvements or intentions in general, the complaint alleges only that they "desired" that the Hospital "begin" purchasing fiducial markers for the urologists. SAC ¶ 47. (The complaint even appears to contradict itself on this point in the next sentence, which alleges that the Hospital "paid" for the fiducial markers. Id. ) And the only allegation as to the legality of what the urologists "desired" the Hospital "begin" doing was that it presented "no compliance concerns." Id. Kietzman's conspiracy claim therefore fails on these grounds as well.
III. Retaliatory Termination, FCA (Count IV)
The FCA provides a remedy, as relevant here, to any employee who is discharged "because of lawful acts done by the employee ... in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). A plaintiff establishes her entitlement to the remedy by showing that (1) her actions were protected activity under the FCA, (2) her employer had knowledge that she was engaged in the protected activity, and (3) there was a causal link between the protected activity and the discharge.[7]
*981 Fanslow v. Chi. Mfg. Center, Inc. , 384 F.3d 469, 479 (7th Cir. 2004).
As for the first element, Section 3730(h)
protects two categories of conduct. The statute has long prevented employers from terminating employment for conduct that is 'in furtherance of an action under [the FCA].' In Brandon [v. Anesthesia & Pain Mgmt. Assocs. , 277 F.3d 936 (7th Cir. 2002) ], [the Seventh Circuit] explained that this language reached conduct that put an employer on notice of potential False Claims Act litigation. In 2009, Congress amended the statute to protect employees from being fired for undertaking 'other efforts to stop' violations of the Act, such as reporting suspected misconduct to internal supervisors.
Halasa v. ITT Educ. Servs., Inc. , 690 F.3d 844, 847-48 (7th Cir. 2012) (original alterations, citation, quotations omitted).
Bethany Circle errs in maintaining (as its sole argument for dismissal) that an FCA retaliation claim is derivative of and necessarily depends on a proved or provable underlying FCA violation.[8] See United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy , 772 F.3d 1102, 1109 (7th Cir. 2014) (affirming dismissal with prejudice of FCA fraud claims, reversing dismissal of FCA retaliation claim). Rather, the question is whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." Fanslow , 384 F.3d at 480 (quoting Moore v. Cal. Inst. of Tech. Jet Propulsion Lab. , 275 F.3d 838, 845 (9th Cir. 2002) ).
A retaliation plaintiff "need not be able to prove fraud on the merits[,]" Abner v. Jewish Hosp. Healthcare Servs., Inc. , No. 4:05-cv-106, 2008 WL 3853361, at *8 (S.D. Ind. Aug. 13, 2008) (citing Neal v. Honeywell Inc. , 33 F.3d 860, 864-65 (7th Cir. 1994) ), and "may proceed under [
*982 Section 3730(h) ] independently of a qui tam action." Fanslow , 384 F.3d at 479 (citing Neal , 33 F.3d at 865 ). "Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together. The statute does not, however, protect an employee who just imagines fraud without proof." Id. at 481 (citations omitted). The employee may not "play[ ] the part of Chicken Little[,] ... imagin[ing] fraud but lack[ing] any objective basis for that belief[.]" Lang v. Nw. Univ. , 472 F.3d 493, 495 (7th Cir. 2006).
Bethany Circle cites two district court cases which it reads to require an underlying FCA violation before an FCA retaliation claim may proceed. Singer v. Progressive Care, SC , 202 F.Supp.3d 815, 828 (N.D. Ill. 2016) ("Because Singer has failed to state [an FCA fraud claim], his FCA retaliation claim fails as well.") (citing United States ex rel. McGinnis v. OSF Healthcare Sys. , No. 11-cv-1392, 2014 WL 378644 (C.D. Ill. Feb. 3, 2014) ("Without finding that the Plaintiff has sufficiently pled the claims for reimbursement were fraudulent or ever presented to the government, the Court cannot conclude that the allegations support a finding that Plaintiff was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA.") ). McGinnis neither cited nor purported to establish a rule that an FCA retaliation claim may proceed only to the extent of an FCA fraud claim; it held simply that the complaint at bar did not state a plausible claim of retaliation. Singer appears to treat the conclusion in McGinnis as flowing from a rule of law, but cites no other authority for such a rule. With due consideration, we decline to follow that court's ipse dixit as contrary to circuit authority. Grenadyor , 772 F.3d at 1109 ; Fanslow , 384 F.3d at 480.
Here, Kietzman stands on firmer ground in the friendlier environs of Rule 8. As for the first element of a retaliation claim, the employee's protected activity, Kietzman's subjective good faith in believing that the Hospital was fraudulently billing Medicare in connection with the radiological scans plausibly appears from her efforts to raise the issue with Hospital management and is not undermined by any other allegation in the complaint. Moreover, Kietzman plausibly alleges that a reasonable employee in the same or similar circumstances might have believed the same when she alleges that several hospitals in the Hospital's "risk retention group" stated that such billing was "illegal, improper, and against CMS rules and regulations[,]" SAC ¶ 28, as well as similar suspicions being voiced by Meyer and, apparently, Siemens medical-equipment trainers. See id. ¶ 36.
It is a much closer question, however, as to whether Kietzman actually undertook any "other efforts to stop" what she reasonably and in good faith believed to be an FCA violation. 31 U.S.C. § 3730(h)(1). She does allege that she told Morgan she was "considering reporting the matter [of the radiology billing] to the federal government[,]" SAC ¶ 61, and that she told Dozier that, "if the [fraudulent radiology] billing were occurring, she would need to report it to the federal government." Id. ¶ 63. In view of Halasa 's admonition that "reporting suspected misconduct to internal supervisors" may constitute protected activity, 690 F.3d at 847-48, see also United States ex rel. Helfer v. Assoc. Anesth's of Springfield, Ltd. , No. 10-3076, 2014 WL 4198199, at *7 (C.D. Ill. Aug. 25, 2014) (plaintiff "reported his findings and concerns about [defendant's] noncompliance [to] his superiors ...."); McGinnis , 2014 WL 378644, at *12 (plaintiff's complaints to superiors that claim submission "would be fraud" "could plausibly be read to constitute *983 'efforts to stop' " FCA violations), and in view of the fact that Kietzman's statements related directly to fraud on the government, compare United States ex rel. Robinson v. Ind. Univ. Health Inc. , No. 1:13-cv-2009, 2016 WL 10567964, at *15 (S.D. Ind. Mar. 30, 2016) ("These complaints ... relate to patient care and medical practices, not fraud on the government to obtain Medicaid payments."), and in view finally of the absence of any contrary argument from Bethany Circle, we conclude that Kietzman's statements suffice to plausibly allege protected activity at the motion to dismiss stage.
As to the second element, there is no question that Dozier and Morgan were aware of Kietzman's protected activity, as Kietzman's statements were made directly to them.
As to the third element, again in the absence of any contrary argument from Bethany Circle, we find Kietzman's allegations sufficient to raise a plausible inference of a causal link between her protected activity and her firing. Indeed, Dozier flatly told Meyer in Kietzman's presence that Dozier "would not tolerate anyone" who reported or threatened to report the Hospital's practices to the government. SAC ¶ 41. Kietzman had received only "exemplary" performance reviews prior to her termination, id. ¶ 8, and none of the concerns about her performance stated in her October 2, 2015, termination letter had apparently been voiced before, raising a plausible inference of pretext. Further raising such inference is the temporal proximity between Kietzman's September 15, 2015, e-mail on the Hospital's billing policy with respect to the radiological scans, and her October 5, 2015, firing. Finally, drawing (as we must) all reasonable inferences in Kietzman's favor, Dozier's reaction to Kietzman's September 15, 2015, e-mail (which merely communicated what Kietzman, relying on Dozier's own prior statements, understood to be an accurate statement of the Hospital's billing practice), was suspiciously overreactive. See id. ¶ 58 ("Why would you copy all these people on this question? This is unprofessional.").
Accordingly, for the reasons above, we conclude that Kietzman has plausibly alleged that she was fired by Dozier from the Hospital in retaliation for voicing her concerns about the Hospital's billing with respect to the radiological scans in the Cancer Center.
IV. Wrongful Termination, Indiana Law (Count III)
Kietzman includes in her complaint a cause of action under Indiana law for wrongful discharge. Bethany Circle's only rejoinder is that we should decline to exercise supplemental jurisdiction over the state-law claim where all the federal claims have failed. But, as we have explained, Kietzman's FCA retaliation claim survives. Having forfeited further arguments for dismissal by failing to raise them, United States ex rel. Rockey v. Ear Inst. of Chi., LLC , 92 F.Supp.3d 804, 826 (N.D. Ill. 2015) (citing G & S Holdings LLC v. Cont'l Cas. Co. , 697 F.3d 534, 538 (7th Cir. 2012) ), Bethany Circle is not entitled to dismissal of any state-law claim. We do not address at this stage whether, or to what extent, this state-law claim may be duplicative of the federal retaliation claim.
Conclusion
For the reasons above, Bethany Circle's motion to dismiss is GRANTED with respect to Counts I and II of Kietzman's second amended complaint. Those claims are DISMISSED WITHOUT PREJUDICE, but without permission to amend her complaint a third time as of right. See Dkt. 64, at 3 ("[A] district court ordinarily should allow a plaintiff one opportunity to amend her complaint after a dismissal under Rule 12(b)(6). By permitting Ms. *984 Kietzman pre-emptively to amend her complaint, the court is in essence allowing her that opportunity now instead of later." (citation omitted) ). Kietzman may seek such leave in the ordinary course, which will be granted only on a clear showing that the above-recited deficiencies with respect to the fraud claims have been cured.
Bethany Circle's motion to dismiss is DENIED with respect to Counts III and IV of Kietzman's second amended complaint.
IT IS SO ORDERED.

The wrongful and retaliatory discharge claims contained in Counts III and IV do not sound in fraud and are not subject to Rule 9(b).

There are also scattered allegations relating to inadequate documentation by "the medical oncologist," SAC ¶ 44-45, 55, but these are nonstarters. There is finally a catch-all residuary allegation that, "upon information and belief, there are additional unknown, but ongoing, fraudulent billing" practices at the Hospital, Id. ¶ 77, but that allegation cannot satisfy even Rule 8(a), not to speak of Rule 9(b). We disregard these allegations without further discussion.

The complaint never even alleges an objective standard by which the scans' propriety and necessity was measured. See United States ex rel. Presser v. Acacia Mental Health Clinic, LLC , 836 F.3d 770, 779 (7th Cir. 2016) ("[Relator] provides no medical, technical, or scientific context which would enable a reader of the complaint to understand why [defendant's] alleged actions amount to unnecessary care forbidden by ... statute.... [T]he complaint does not provide any reasons why these treatments actually were unnecessary other than [Relator's] personal view."). The complaint does allege that other hospitals in the Hospital's "risk retention group," SAC ¶ 28, as well as medical-equipment trainers from Siemens, id. ¶ 36, excepted to the Hospital's billing practices, but not to the medical necessity or propriety of a second scan per se . Moreover, the complaint simultaneously alleges (or appears to allege) that the Hospital's billing practices were in fact approved by the "Association of Community Cancer Centers." Id. ¶ 54. Taken together, these allegations suggest a difference of opinion about billing, and no opinion at all about treatment other than Kietzman's.

Escobar interpreted Subsection (A), which, unlike Subsection (B), does not by its terms require materiality. But the Supreme Court approved implied false certification as a theory of FCA liability only after first holding that FCA "fraud" incorporates common-law elements, including materiality. Univ'l Health Servs., Inc. v. United States ex rel. Escobar , 136 S. Ct. 1989, 1999 (2016). The Court found it unnecessary to decide "whether [Subsection (A)'s] materiality requirement is governed by [Section 3729(b)(4), the statutory definition of materiality for the purposes of Subsection (B), itself derived from Supreme Court case law interpreting "common-law antecedents[,]"] or derived directly from the common law." Id. at 2002.

The same rule defeats the allegations in paragraphs 29 (regarding Morgan and Dozier prompting Combs to send e-mails to other hospitals), 73 and 76 (relating to billing for full ultrasounds), 77 (relating to "additional unknown" fraud), and 78 ("[F]or each of the foregoing fraudulent billing practices, the United States actually paid the false claims in question.") of the second amended complaint.

In her briefing, Kietzman avers that she is in possession of (but, of course, has not pleaded ) "specific examples, of specific patients" whose services were fraudulently billed to Medicare, and "simply seek[s] guidance on how many examples the Court would like to see and in what detail." Pl.'s Br. Opp. 29 n.6. This is a bewildering request. This Court does not sit to dispense complaint drafting advice to learned counsel. The pages of the Federal Reporter and Federal Supplement overflow with allegations of fraud in the provision of health-care services that have been found to satisfy Rule 9(b) while simultaneously "avoid[ing] HIPAA issues[.]" Id.

The Seventh Circuit has allowed an FCA retaliation plaintiff to proceed on a showing of mixed-motive discharge, that is, by showing that her "discharge was motivated, at least in part, by the protected conduct." Fanslow v. Chi. Mfg. Center, Inc. , 384 F.3d 469, 479 (7th Cir. 2004). (This is the causation standard cited by Kietzman; Bethany Circle cites no standard.) But the Supreme Court's declaration that "because of" denotes but-for causation in analogous antiretaliation and antidiscrimination contexts, Univ. of Tex. Sw. Med. Ctr. v. Nassar , 570 U.S. 338, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013) (Title VII retaliation); Gross v. FBL Fin. Servs., Inc. , 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) (ADEA discrimination), calls the viability of mixed-motive cases under the FCA into serious doubt. See Serwatka v. Rockwell Automation, Inc. , 591 F.3d 957, 961 (7th Cir. 2010) ("[Gross ] suggests that when another anti-discrimination statute [contains "because of" language and] lacks [language expressly recognizing mixed-motive claims], a mixed-motive claim will not be viable under that statute."); United States ex rel. Marshall v. Woodward, Inc. , 85 F.Supp.3d 973, 984-85 (N.D. Ill. 2015) (citing Gross , Nassar , and Serwatka , holding FCA retaliation requires but-for causation). But see United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc. , 764 F.3d 699, 715 (7th Cir. 2014) (citing Fanslow , reciting mixed-motive standard in FCA case). As neither the Seventh Circuit, nor the parties here, have squarely addressed this question as applied to the FCA, and because the answer will not be dispositive of our ruling on the instant motion to dismiss, we do not address it further.

Kietzman appears to mistake Bethany Circle's argument on this point for a different argument, which it has not made, relating to how imminent FCA qui tam litigation must be before the Act's antiretaliation provision is triggered, a question which, as Kietzman correctly though irrelevantly points out, is of diminished importance following the 2009 "other efforts" amendment to the FCA. See United States ex rel. Helfer v. Assoc. Anesth's of Springfield, Ltd. , No. 10-3076, 2014 WL 4198199, at *6-7 (C.D. Ill. Aug. 25, 2014) (citing Halasa , noting Brandon 's"distinct possibility" of litigation standard too narrow to account for 2009 "other efforts" amendment; citing Fanslow , noting Seventh Circuit "seemed to retreat" from Brandon 's"high bar" even before 2009).